1                                                                                           JDN

2  **WO**

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                         FOR THE DISTRICT OF ARIZONA

8

9   David Standley,                        )    No. CV 10-1867-PHX-DGC (ECV)
                                           )
10            Plaintiff,                    )    **ORDER**
                                           )
11  v.                                     )
                                           )
12  Charles Ryan, et al.,                  )
                                           )
13            Defendants                    )
                                           )
14  _____)

15       Plaintiff David Standley filed a civil rights action under 42 U.S.C. § 1983 against

16  multiple Arizona Department of Corrections (ADC) officials (Doc. 13).  Before the Court

17  is Defendants' Motion for Summary Judgment (Doc. 43), to which Plaintiff did not respond.

18  The Court will grant Defendants' motion and terminate the action.

19  **I.      Background**

20       Plaintiff's claims relate to his confinement at the ADC Lewis Complex-Morey Unit

21  and the ADC Eyman Complex-Browning Unit (Doc. 13 at 1[1]).  He named the following

22  Defendants: (1) Director Charles Ryan; Deputy Wardens (2) Alfred Ramos, (3) Hugh

23  Matson, and (4) Josie James; (5) Security Threat Group (STG) Chair/Security Operations

24  Administer Robert Patton; (6) acting STG Coordinator Robert Yesenski; and (7) STG

25  _____

26       [1]Because of the extra pages Plaintiff included within the standard civil rights complaint
    form, the citations to the First Amended Complaint refer to the pages in the Court's Case
27  Management/Electronic Case Filing system (see Doc. 13).  Other citations throughout this
    Order include both the Document numbers and the subject exhibit/attachment and the
28  CM/ECF page numbers.

Committee Member Jeffrey Freeland (id. at 3-4).

In Count I of his First Amended Complaint, Plaintiff alleged that Yesenski, Freeland, Matson, James, and Patton violated Plaintiff's Fourteenth Amendment due process rights during the STG validation process.  Plaintiff also alleged that his continued indefinite confinement in the STG unit by Ryan and Ramos violates his due process rights because his conditions of confinement constitute atypical and significant hardship yet he receives no meaningful opportunity for review or reclassification (id. at 5-13).

In Count II, Plaintiff alleged that the conditions of his confinement violate the Eighth Amendment prohibition against cruel and unusual punishment.  He claimed that Ryan, Ramos, and Patton have kept him in solitary confinement since September 2008, and denied him the minimal civilized measure of life's necessities; his alleged conditions include confinement in almost complete isolation, constant cell illumination, denial of adequate exercise or exercise facilities, denial of adequate food, lack of privileges, limited showers, and denial of cleaning supplies (id. at 14-16, 8-10).

In Count III, Plaintiff alleged that the policy that requires debriefing for his custody status to change violates the Eighth Amendment.  Plaintiff stated that the only way he can change his custody status is to become a prison informant, which creates a substantial risk of harm to him and his family, and he claimed that Defendants are aware of this risk. Plaintiff claimed that by enforcing this policy, Ryan and Ramos are deliberately indifferent to a substantial risk of harm (id. at 18-20).

Defendants now move for summary judgment on the grounds that (1) Plaintiff failed to exhaust administrative remedies for some of his claims as required under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997a(a); (2) Plaintiff's STG validation hearing comported with due process; (3) the debriefing process comports with due process; (4) annual reviews are constitutional; (5) the conditions of confinement at the Browning Unit are constitutional; and (6) Defendants are entitled to qualified immunity from monetary damages (Doc. 43).  The Court issued the Notice required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998), which informed Plaintiff of his obligation to respond and the

requirements of Federal Rule of Civil Procedure 56 (Doc. 45).  Plaintiff did not file a response, and the time to do so has expired.  Therefore, in its summary judgment analysis, the Court will construe Plaintiff's verified First Amended Complaint as an affidavit in opposition to the summary judgment motion.  See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence).

**II.    Exhaustion**

Defendants' first argument for summary judgment is that Plaintiff did not properly exhaust remedies for some of the claims raised in the First Amended Complaint (Doc. 43 at 5-7).  Exhaustion is a matter in abatement, which is properly raised in an unenumerated Rule 12(b) motion to dismiss rather than a motion for summary judgment.  Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  To the extent that Defendants argue nonexhaustion, the motion will be construed as an unenumerated Rule 12(b) motion to dismiss.

**A.    Legal Standard**

Under the PLRA, an inmate must exhaust available administrative remedies before bringing a federal action.  See 42 U.S.C. § 1997e(a); Griffin v. Arpaio, 557 F.3d 1117, 1119 (9th Cir. 2009).  Exhaustion is required for all suits about prison or jail life, Porter v. Nussle, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, Booth v. Churner, 532 U.S. 731, 741 (2001).  An inmate must complete the administrative review process in accordance with the applicable rules.  See Woodford v. Ngo, 548 U.S. 81, 92 (2006).

Exhaustion is an affirmative defense.  Jones v. Bock, 549 U.S. 199, 212 (2007).  Therefore, the defendant bears the burden of raising and proving the absence of exhaustion.  Wyatt, 315 F.3d at 1119.  Because exhaustion is a matter in abatement in an unenumerated Rule 12(b) motion, a court may look beyond the pleadings to decide disputed issues of fact.  Id. at 1119-20.  When doing so, a court has broad discretion as to the method to be used in

1    resolving the factual dispute.  Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837

2    F.2d 365, 369 (9th Cir. 1988) (quotation omitted).

3        **B.    Arguments**

4            Defendants contend that Plaintiff did not submit grievances and therefore did not

5    exhaust remedies for numerous claims set forth in the First Amended Complaint (Doc. 43 at

6    5-7).  To support their contention, Defendants submit the declaration of Aurora Aguilar, an

7    ADC Hearing Officer, who describes the steps in the ADC Inmate Grievance Procedures: (1)

8    attempt to resolve issue through informal means; (2) submit an Inmate Letter to the inmate's

9    assigned CO III; (3) submit a formal grievance to the Deputy Warden; (4) submit an Inmate

10   Grievance Appeal to the Warden; and finally, (5) appeal to the Director (Doc. 44, Ex. B,

11   Aguilar Decl. ¶¶ 1, 7 (Doc. 44-1 at 37-39)).  Aguilar avers that a review of ADC grievance

12   logs shows that Plaintiff did not file any grievances related to the following issues: (1) lack

13   of cleaning supplies for recreation enclosure; (2) lack of additional clothing for recreation;

14   (3) confinement in a cell with no window and with constant cell illumination;

15   (4) confinement under heightened security measures; (5) inability to earn early release

16   credits; and (6) indefinite confinement at Browning (id. ¶ 13 (Doc. 44-1 at 40-41)).

17           In his declaration, Yesenski avers that although Plaintiff appealed his STG validation,

18   he did not specifically appeal that he was denied (1) written notice of the charges against

19   him; (2) the ability to prepare a defense for his hearing; (3) the ability to question witnesses;

20   or (4) the ability to provide rebuttal evidence at his hearing (id., Ex. A, Yesenski Decl. ¶ 25

21   (Doc. 44-1 at 10)).  Defendants contend that, based on this evidence, Plaintiff did not exhaust

22   remedies and these claims should be dismissed (Doc. 43 at 6-7).  In his Complaint, Plaintiff

23   indicates that he submitted a request for administrative relief for all of his claims and that he

24   appealed them to the highest level (Doc. 13 at 5, 14, 18, 21).

25       **C.    Analysis**

26           **1.  Count I**

27           Defendants assert that Plaintiff did not exhaust his claims that he was denied due

28   process during the STG validation process; these claims are set forth in Count I.

1    As stated, Defendants must demonstrate that there were remedies available to Plaintiff

2    to exhaust these claims.  See Wyatt, 315 F.3d at 1119; see also Brown v. Valoff, 422 F.3d

3    926, 936-37 (9th Cir. 2005).  Defendants' evidence demonstrates that Plaintiff could not have

4    raised his due process claims in the standard grievance process apart from the Validation

5    Appeal.  The relevant portion of the policy, Department Order (DO) 802, states that the

6    Inmate Grievance Procedure does not serve as a duplicate or alternate grievance process for

7    complaints about STG Validation because STG Validation has its own appeal process (Doc.

8    44, Ex. B, Attach. 1 (Doc. 44-1 at 45-46)).  Also, Aguilar avers that the inmate grievance

9    process may not be used to grieve STG validation (id., Ex. B, Aguilar Decl. ¶ 6 (Doc. 44-1

10   at 38).

11   Defendants submit that Plaintiff should have appealed his due process claims in his

12   STG Validation Appeal.  But the relevant policy, DO 806, states that "[i]nmates may appeal

13   only those specific reasons why they were validated" (id., Ex. C, Attach. 2, DO 806.05

14   § 1.1.1.1 (Doc. 44-2 at 64)).  Jerry Dunn, STG Unit Supervisor, avers that the STG Appeals

15   Committee has interpreted this provision to include any claim related to the validation

16   process (id., Ex. C, Dunn Decl. ¶ 54 (Doc. 44-2 at 15-16)), but Defendants fail to explain

17   how inmates are made aware of this interpretation.  Relevant evidence that relief remains

18   available to inmates includes "information provided to the prisoner concerning the operation

19   of the grievance procedure[.]"  Brown, 422 F.3d at 937 ("information provided the prisoner

20   is pertinent because it informs our determination of whether relief was, as a practical matter,

21   'available'") (quotation omitted).  Here, the governing policy explicitly informed Plaintiff

22   that he could appeal *only* the specific reasons for his validation, which he did (see Doc. 44,

23   Ex. A, Attachs. 4-6 (Doc. 44-1 at 24-35)).  There is no evidence that Plaintiff was informed

24   he could also appeal due process concerns that were not directly related to the reasons for his

25   validation.  The Court notes that Defendants' evidence includes a grievance appeal to the

26   Director in which Plaintiff complains, among other things, that he was denied adequate

27   means of challenging his validation and due process (Doc. 44, Ex. B, Attach. 3 (Doc. 44-1

28   at 57)).  The Director's appeal response did not address this complaint or inform Plaintiff that

he could have challenged alleged due process violations in the Validation Appeal (id. (Doc. 44-1 at 56)).  See Brown, 422 F.3d at 937 (relevant evidence showing that relief is available also includes response memoranda provided to the prisoner).

The Court finds that Defendants have not met their burden to establish that a review process was available to Plaintiff to grieve his concerns about the lack of due process in the validation proceedings.  Defendants' request to dismiss Plaintiff's due process claims in Count I for nonexhaustion will be denied.

## 2.  Count II

Defendants list specific conditions of confinement which they claim Plaintiff did not grieve (Doc. 43 at 6).  A review of Plaintiff's grievance documents reflect that at least one grievance appeal to the Director complained about the lack of direct sunlight for weeks at a time (Doc. 44, Ex. B, Attach. 4 (Doc. 44-1 at 68)).  The Court finds this complaint sufficiently relates to Plaintiff's claim that he was confined in a cell with no window.  Similarly, Plaintiff's grievances that refer to unequal treatment, restricted privileges, and harsher conditions than other prisoners are sufficient to relate to his claim that he was subject to heightened security measures (id., Ex. B, Attach. 3 (Doc. 44-1 at 55-65)).

In one of his grievance appeals to the Director, Plaintiff complained that the Step-Down Program is merely a "mockery" and not a viable means to exit the Browning Unit (id., Ex. B, Attach. 3 (Doc. 44-1 at 58)).  Although he did not use the words "indefinite confinement," the Court finds that Plaintiff's grievance is sufficient to put officials on notice that he was complaining about the inability to leave the Browning Unit, which relates to his claim of indefinite confinement.

Other grievance documents show exhaustion of his complaints about the loss of good time credits and desire to have those credits restored (Doc. 44, Ex. B, Attach. 6 (Doc. 44-1 at 88-96)).

Defendants' evidence supports, however, that Plaintiff did not file grievance appeals for complaints that he was denied cleaning supplies for the recreation area and additional clothing for recreation or that he was subject to constant cell illumination (Doc. 44, Ex. B,

Aurora Decl. ¶ 13 (Doc. 44-1 at 40-41)).  In failing to respond to Defendants' motion, Plaintiff does not dispute their evidence or show that he in fact grieved these particular issues.  To the extent that Plaintiff alleges his Eighth Amendment rights were violated by the lack of cleaning supplies for the recreation pen, the lack of additional clothes for recreation, or constant cell illumination, his claims are dismissed for nonexhaustion.  But because the majority of Plaintiff's conditions-of-confinement claims in Count II were properly exhausted, the Court will not dismiss Count II entirely.

**III.    Summary Judgment Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

If the movant fails to produce evidence that negates an essential element of the nonmovant's claim or defense or shows that the nonmovant does not have enough evidence of an essential element to carry its ultimate burden at trial, the nonmovant need not produce anything.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law), and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant).  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968), but must "come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co., Ltd. v. Zenith

1   Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P.
2   56(c)(1).

3       At summary judgment, the judge's function is not to weigh the evidence and
4   determine the truth, but to determine whether there is a genuine issue for trial. Anderson,
5   477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable
6   inferences are to be drawn in his favor." Id. at 255.

7   **IV.    Factual Assertions Relevant to Counts I and III**

8       **A.    STG Validation, Renunciation/Debriefing, and Step-Down Program**

9       In support of their summary judgment motion, Defendants submit a separate
10  Statement of Facts (DSOF), which is supported by the declarations of Yesenski and STG
11  Supervisor Dunn and attachments (Doc. 44, Exs. A, C).  The relevant factual assertions are
12  summarized as follows:

13      In 1991, the ADC established an STG policy in an effort to control prison gang
14  activity in Arizona's prisons and minimize the threat posed by gangs (DSOF ¶¶ 4-5).  The
15  STG policy provides for the identification and certification of prison gangs and inmate STG
16  members (id. ¶ 14).  The purpose of this policy is to minimize the threat that gangs and gang-
17  like activity poses to the operation of the prison (id. ¶ 15).

18      Under this policy, an STG "Suspect" is an inmate believed to be involved in an STG
19  (id. ¶ 41).  To be identified as an STG Suspect, there must be documentation of certain
20  specific criteria, such as self-proclamation, tattoos, photographs, association and contacts (id.
21  ¶ 42; Doc. 44, Ex. C, Attach. 2 (DO 806, Definitions) (Doc. 44-2 at 75-76)).

22      Once an inmate is identified as a Suspect, the SSU staff initiates a "Suspect File,"
23  which contains confidential information on the Suspect including an STG Identifying
24  Questionnaire (DSOF ¶ 44).  If there is sufficient evidence in an inmate's Suspect File to
25  meet the validation criteria, the SSU staff prepares an STG Member Validation Packet (id.
26  ¶¶ 47, 51).

27      An STG Validation Committee, which is made up of three deputy wardens or
28  associate deputy wardens, then conducts an STG Validation Hearing (id. ¶¶ 52-53).  The

Complex SSU Coordinator notifies the inmate of his Validation Hearing with the Hearing Notification form—Hearing Notice—at least 10 days before the hearing so that the inmate has time to prepare a defense (id. ¶ 54). The inmate signs and dates the Hearing Notice to acknowledge that he received it (id.). The inmate chooses whether to appear at the hearing or waive his right to appear and whether he will request witnesses (id.). The inmate's choices are denoted on the Hearing Notice by checking boxes or initialing next to each choice (id.).

At the validation hearing, unless the inmate has waived his right to appear, he is present throughout the hearing and presents evidence if he chooses to do so (id. ¶¶ 55-56).

If an inmate is validated, it means that the inmate is determined to be or to have been a member of an STG (id. ¶ 48). Also, if an inmate's participation level meets the criteria of membership in an STG, but the STG has not granted the inmate membership, the inmate can still be validated as a member (id.). Validation is determined on a point system, with varying point values assigned to specific criteria of evidence (id. ¶¶ 49-50). Validation requires ten or more points in at least two of the criteria categories (id. ¶ 50).

Once an inmate has been validated as a STG member through the STG validation process, the inmate may appeal the validation decision, choose to renounce his STG membership through the debriefing process, or accept his validation and not renounce his STG membership (id. ¶ 58). An inmate who refuses to renounce and debrief receives an annual review by Classification staff (id. ¶ 62). The review consists of an inquiry as to (a) whether the inmate is still associated with an STG or (b) whether the inmate has disassociated himself from the STG, renounced his gang affiliation, and is sincerely willing and able to debrief (id.). A validated inmate is considered an ongoing threat to prison security and therefore is segregated and assigned to be housed at the maximum-security Browning Unit until the inmate is released from prison, renounces his STG membership and satisfactorily debriefs, or successfully completes the ADC Step-Down Program (id. ¶ 64).

Renunciation occurs when a validated STG member renounces his STG affiliation (id. ¶ 66). This is followed by the debriefing process, in which an STG Unit staff member uses

a STG Questionnaire to document the claim that an inmate is no longer a member of an STG (id. ¶ 67).   The objectives of the debriefing process are to (1) learn enough about the validated STG member and the STG to determine whether the inmate has withdrawn from the STG, (2) provide information regarding the STG's structure and activity that would adversely impact the STG and assist in management of the STG population, and (3) provide sufficient information to determine if the inmate requires protection from other STG members or suspects (id. ¶ 68).   A validated STG member who renounces membership and satisfactorily debriefs is housed in Protective Segregation (PS) and is then reviewed for permanent PS status (id. ¶ 71).   A validated STG member can request to renounce and debrief at any time (id. ¶ 75).

As an alternative to the debriefing process, a validated STG member may be able to leave the Browning Unit through the Step-Down Program, which provides an inmate the opportunity to demonstrate that he is not involved in STG activity (id. ¶ 78).   To be eligible for the Step-Down Program, an inmate must have completed a continuous 24-month period where he did not participate in any documented gang activity, and he must make a written request to participate in the program (id. ¶¶ 98-99).   There are different phases in the Step-Down Program that provide inmates progressively more freedom in small increments, and the program must be completed within 24 months of the date of entry into the program (id. ¶¶ 103, 105)

## B.    Plaintiff's Validation

Plaintiff was served with the Hearing Notice on September 12, 2008 (id. ¶ 114).   This Notice informed Plaintiff that he was suspected of being an STG member of the Aryan Brotherhood, the basis for that suspicion and the charges against him, and that his Validation Hearing was scheduled for September 26, 2008, at 9:00 a.m. (id. ¶ 115).[2]   On the Hearing

---

[2]DSOF ¶ 115 mistakenly states that the Hearing Notice indicated the Validation Hearing was scheduled for September 28, 2009.  The Hearing Notice reflects that the hearing was scheduled for September 26, 2008 (Doc. 44, Ex. A, Attach. 3 (Doc. 44-1 at 21-23)).

1  Notice form, Plaintiff checked the boxes indicating that he would appear at the hearing and

2  did not request witnesses (id. ¶ 116). The Notice included a "Statement of Charges" section

3  that laid out in detail the evidence to be presented to support Plaintiff's validation (id. ¶¶ 118-

4  119).

5      The validation hearing was held on September 26, 2008, with Plaintiff in attendance

6  (id. ¶¶ 120, 124). The STG Committee included Chairperson Freeland and Deputy Wardens

7  Matson and James (id. ¶ 121). Plaintiff was able to review each piece of evidence used to

8  support his validation and provide a response or explanation to the Committee (id. ¶¶ 122-

9  123). The Committee found evidence to support 19 points in three categories, which was

10 sufficient to validate Plaintiff as an STG member (id. ¶¶ 125-126). Plaintiff received written

11 results of the Validation Hearing, signed the Hearing Results form, and indicated that he

12 chose to appeal the decision (id. ¶¶ 127-128).

13     In his appeal, which was set forth in a three-page Inmate Letter, Plaintiff presented

14 specific challenges for appeal of the validation decision (id. ¶¶ 129, 132). The STG Appeals

15 Committee upheld the validation (id. ¶¶ 131-132).

16     To date, Plaintiff has not made a request to renounce and debrief, nor has he made a

17 request to participate in the Step-Down Program (id. ¶ 133).

18 **V.    Count I-Due Process**

19     **A.    Legal Standard**

20     The Due Process Clause of the Fourteenth Amendment prohibits the states from

21 "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const.

22 amend. XIV, § 1. To determine whether a procedural due process violation has occurred, a

23 court engages in a two-step analysis. First, a court looks to whether the person possesses a

24 constitutionally-cognizable liberty interest with which the state has interfered. Sandin v.

25 Conner, 515 U.S. 472, 485-87 (1995). Second, if the state has interfered with a liberty

26 interest, a court looks to whether this interference was accompanied by sufficient procedural

27 and evidentiary safeguards. Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989).

28     It is well-settled that placement in maximum security segregation units implicates a

liberty interest requiring due process protections.  Wilkinson v. Austin, 545 U.S. 209, 224 (2005).  An inmate may be deprived of his liberty interest so long as he is accorded the proper procedural protections.  For the initial decision to place an inmate in maximum custody, due process is generally satisfied by notice of the factual basis for the placement and an opportunity to be heard.  Id. at 224-226; Hewitt v. Helms, 459 U.S. 460, 476 (1983), overruled in part on other grounds by Sandin, 515 U.S. 472.  "Requiring officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason."  Wilkinson, 545 U.S. at 226.

After an inmate is placed in maximum security segregation, he is entitled to "some sort" of periodic review of his status.  See Hewitt, 459 U.S. at 477 n. 9 ("administrative segregation may not be used as a pretext for indefinite confinement of an inmate.  Prison officials must engage in some sort of periodic review of the confinement of such inmates").  To determine whether the periodic review afforded Plaintiff conforms to due process requirements, the Court must consider what are called the Mathews factors: "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Wilkinson, 545 U.S. at 224-25 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

## B.    Parties' Contentions

### 1.  Defendants

In their motion, Defendants acknowledge that Plaintiff possessed a liberty interest in avoiding transfer to the Browning Unit and therefore was entitled to sufficient procedural and evidentiary standards (Doc. 43 at 8).  They submit that due process requires notice, but that it does not require detailed written notice (id. at 9).  According to Defendants, by signing and dating the Hearing Notice, Plaintiff acknowledged receipt of written notice that contained

a detailed description of the charges and evidence to be used at the validation hearing (id. at 9-10).

In response to Plaintiff's claim that he was denied the ability to request and question witnesses, Defendants present the hearing documents, which include Plaintiff's signature and date and his check of the box stating "I DO NOT request witnesses" (id. at 10, citing DSOF ¶ 116). Defendants further note that Plaintiff raised no complaint about the lack of his own witnesses either at the validation hearing or in his appeal of the validation decision (Doc. 43 at 10-11). Defendants also argue that the opportunity to call witnesses is not constitutionally required (id. at 11).

Defendants assert that Plaintiff was given the opportunity to be heard and, each time evidence was presented, he was able to view it and discuss it (id. at 11-13). Given these facts, Defendants argue that Plaintiff was provided sufficient due process (id. at 14). Defendants submit that both this Court and the Ninth Circuit Court of Appeals have reviewed the ADC validation process and found that it comports with due process (id., citing cases)).

With respect to Plaintiff's claim that Ryan and Ramos violate due process by depriving Plaintiff of any meaningful opportunity for review or reclassification, Defendants argue that the debriefing process comports with due process (id. at 17-18). Defendants submit that annual reviews are sufficient because an STG inmate's classification will not change unless he debriefs or completes the Step-Down Program (id. at 18). According to Defendants, whether an inmate remains a security risk is based on whether he remains an STG member, and the only way to dissociate from an STG is through debriefing or the Step-Down Program, which Plaintiff may do at any time (id.).

For these reasons, Defendants request summary judgment on Plaintiff's due process claims in Count I.

### 2. Plaintiff

In his First Amended Complaint, Plaintiff alleges that he was denied written notice of the charges against him prior to the validation hearing and therefore was denied the ability to marshal facts to prepare a defense (Doc. 13 at 6). He further alleges that he was not

1   allowed to obtain witness statements (id. at 7).  And he claims that he was not allowed to

2   present his views at the hearing, that the Validation Committee validated him without

3   evidence in the record, and that he was not provided a written statement indicating the

4   evidence the Committee relied upon (id.).  Finally, Plaintiff avers that when he appealed his

5   validation, he was denied a non-adversarial review and not provided a written statement

6   outlining the reasons his appeal was denied (id. at 12).  According to Plaintiff, Patton did not

7   even address the issues that Plaintiff raised in his appeal (id.).

8   With respect to the annual reviews, Plaintiff avers that they are very limited and

9   amount to nothing more than a "rubber stamp" of the initial validation (id. at 11).

10   **C.   Analysis**

11   **1. Notice, Opportunity to Question Witnesses, Hearing**

12   Although Plaintiff claims that he did not receive notice of the allegations against him

13   prior to his hearing, the record includes a copy of the Hearing Notice, which is signed and

14   dated by Plaintiff as received on September 12, 2008 (Doc. 44, Ex. A, Attach. 3 (Doc. 44-1

15   at 20-23)).  The Notice clearly states that Plaintiff is accused of being a member of an STG

16   and identifies the specific evidence—letters, envelopes, an e-mail, and a Phoenix Police

17   report—that supports that accusation (id.).  In failing to respond to this evidence, Plaintiff

18   does not dispute that the signature on the Hearing Notice is his or that he received this notice

19   on September 12, 2008.

20   The Court finds that the Hearing Notice more than adequately sets forth a "brief

21   summary of the factual basis" for suspecting Plaintiff of STG membership.  See Wilkinson,

22   545 U.S. at 226.  The Notice provided sufficient information, including specific names of

23   other inmates connected to some of the evidence, for Plaintiff to prepare a rebuttal to the

24   charges.  See id.  Further, on each of the three pages of the Notice,  Plaintiff checked boxes

25   indicating that he would appear at the validation hearing and did not request any witnesses

26   (Doc. 44, Ex. A, Attach. 3 (Doc. 44-1 at 21-23)).

27   Defendants also proffer a copy of hearing "results" form, which explains the basis for

28   the Committee's findings for each category and specifies the evidence that the Committee

1  relied upon (id., Attach. 4 (Doc. 44-1 at 25-28)).  Plaintiff signed and dated each page of the
2  "results" form (id.).

3     The Court notes that inmate gang validations are subject to the "some evidence"
4  standard, which sets a low bar.  A single piece of evidence may be sufficient if it has
5  "sufficient indicia of reliability."  Bruce v. Ylst, 351 F.3d 1283, 1287-88 (9th Cir. 2003).
6  Courts are not required to "examine the entire record, independently assess witness
7  credibility, or reweigh the evidence; rather, 'the relevant question is whether there is any
8  evidence in the record that could support the conclusion.'"   Id. at 1287 (citing
9  Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455-56 (1985)).  Here, the "results"
10 form reflects that there was sufficient evidence to support Plaintiff's validation.

11    On the record before the Court, the Hearing Notice, the validation hearing, and the
12 evidentiary standard applied all met due process requirements.

13            **2.  Annual Reviews**

14    Annual reviews alone have been found to be insufficient to ensure due process.
15 Hernandez v. Schriro, 357 F. App'x 747, 749 (9th Cir. 2009) (citation omitted).  Defendants'
16 evidence shows that in addition to annual reviews, Plaintiff can renounce and debrief at any
17 time (Doc. 44, DSOF ¶ 75).  This Court has previously found that annual reviews, combined
18 with the option to debrief at any time, satisfy due process.  Hernandez v. Schriro, 2011 WL
19 2910710, at *8 (D. Ariz. July 20, 2011).  In Hernandez, the Court balanced the three
20 Mathews factors and determined that the plaintiff could not show that the process afforded
21 him – annual reviews with debriefing available – was inadequate.  Id. at *8-9.  "Because
22 debriefing is available at any time, the periodic review of [the plaintiff's] status satisfies the
23 Mathews test[.]"  Id., at *9.

24    There is nothing in the instant case that leads this Court to a different conclusion.  As
25 to the first Mathews prong, Plaintiff's interest in avoiding confinement at the Browning Unit
26 is more than minimal, but it is not comparable to the right to be free from confinement at all.
27 Prisoners already have their liberty interests curtailed by virtue of their state- or federal-court
28 convictions.  See Wilkinson, 545 U.S. at 225.

1    In considering the second prong—the risk of erroneous deprivation—the Court finds
2    little risk because the annual review is an objective and factual determination.  The annual
3    reviews afford Plaintiff an opportunity to indicate whether he has debriefed or desires to so
4    (see Doc. 43 at 18).  See Toussaint v. McCarthy, 801 F.2d 1080, 1101 (9th Cir. 1986),
5    overruled in part on other grounds by Sandin, 515 U.S. 472.  Plaintiff does not dispute
6    Defendants' evidence that he may renounce and debrief at any time.

7    With respect to the final factor—the government's interest—the Hernandez Court
8    recognized the legitimate penological interest that prisons have in stopping gang activity.
9    2011 WL 2910710, at *9.  Plaintiff presents nothing to challenge this fact.

10    In summary, the Court finds no material factual dispute as to whether due process was
11    satisfied during the validation proceedings or whether annual reviews with debriefing
12    available violate due process.  Accordingly, Defendants are entitled to summary judgment
13    on Plaintiff's due process claims in Count I.

14    **VI.    Count III-Debriefing and Threat to Safety**

15        **A.    Legal Standard**

16    The Eighth Amendment requires prison officials to protect prisoners from violence
17    at the hands of other prisoners.  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  To establish
18    an Eighth Amendment violation, a prisoner must first satisfy an objective requirement—he
19    must show that he has been transferred into "conditions posing a substantial risk of serious
20    harm."  Id. at 834.  Then, he must satisfy a subjective requirement—he must show that the
21    defendant was aware of the risk and disregarded it.  Id. at 834, 837.

22        **B.    Parties' Contentions**

23            **1.    Defendants**

24    Defendants argue that Plaintiff presents only a generalized threat that debriefing will
25    put him at risk as a "snitch" and that such speculation does not implicate the Eighth
26    Amendment (Doc. 43 at 15).  Defendants also assert that ADC has taken affirmative steps
27    to maximize the safety of debriefed inmates by placing them in protective segregation, which
28    protects inmates who are threatened by other inmates (id. at 16).  They submit that this is a

reasonable response to the possible risk of participating in the debriefing process (id.). Defendants also note that under the Step-Down Program, inmates avoid the snitch label because they do not have to provide prison officials information about prison gangs (id.). Lastly, Defendants argue that because Plaintiff has not debriefed or sought to enter the Step-Down Program, he does not have standing to challenge the programs (id. at 17).  For these reasons, Defendants seek summary judgment on Count III (id. at 17, 19).

### 2. Plaintiff

In his pleading, Plaintiff avers that the debriefing process exposes both him and his family to a well-known and serious risk of harm by requiring him to become an informant (Doc. 13 at 19).

### C.   Analysis

Courts have recognized that being labeled a snitch can place an inmate at a risk of harm, see Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989); see also Wilkinson, 545 U.S. at 227, but it is unclear whether this same risk is present when an inmate is placed in PS as opposed to the general population, see Hernandez, 2011 WL 2910710, at *5 (distinguishing the risk of harm faced by inmates who are labeled as snitches and placed in general population with debriefed inmates who are labeled as snitches and placed in PS). Even if the Court were to assume that the objective prong of the deliberate indifference analysis is met when an inmate debriefs and is identified as a snitch, Plaintiff has not satisfied the subjective prong. See Farmer, 511 U.S. at 833.  Defendants' undisputed evidence shows that they do not disregard this risk to inmate safety.  The evidence shows that a debriefed STG member is placed in PS and not housed with other inmates (Doc. 44, DSOF ¶ 71 (Doc. 40 at 19-20)).  The clear purpose of this action is to protect the inmate from harm by other inmates.  In failing to respond to Defendants' evidence, Plaintiff presents nothing to suggest that PS placement does not provide reasonable safety to debriefed inmates following their transfer out of the Browning Unit. See Farmer, 511 U.S. at 844 (finding that a prison official who responds reasonably to a risk is not liable, even if the harm ultimately is not averted).

1    Moreover, because the record shows that Plaintiff has not debriefed, he cannot show

2    that he has faced or will face a substantial risk of serious harm in PS.  See Gaut v. Sunn, 810

3    F.3d 923, 925 (9th Cir. 1987) (the "mere threat" of future bodily harm to a prisoner may not

4    provide a basis for a cognizable Eighth Amendment claim).

5    In short, Plaintiff cannot demonstrate that debriefing is not an adequate alternative to

6    annual reviews or that it would place him at a serious risk of harm in violation of the Eighth

7    Amendment.  The Court therefore will grant summary judgment to Defendants on Count III.

8    **VII.    Count II-Conditions of Confinement**

9    Plaintiff alleges that the following conditions of his confinement violate the Eighth

10   Amendment: (1) isolation; (2) inadequate exercise facilities and limited exercise; (3) denial

11   of adequate food; (4) restricted privileges; and (5) lack of cleaning supplies (Doc. 13 at 8-10,

12   14).  In support of their request for summary judgment on Count II, Defendants proffer the

13   declaration of Carlos Reyna, a Lieutenant at the ADC Eyman Complex (Doc. 44, Ex. D

14   (Doc. 44-3 at 1-20)), and various attachments, including copies of ADC policies governing

15   inmate work activities, education services, inmate property, visitation, phone calls, nutrition

16   and menus, and arts and crafts (id., Attachs. 1-11 (Doc. 44-3 at 21-76)).

17   **A.    Legal Standard**

18   "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual

19   punishment forbidden by the Eighth Amendment."  Whitley v. Albers, 475 U.S. 312, 319

20   (1986).  "Among 'unnecessary and wanton' inflictions of pain are those that are totally

21   without penological justification."  Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (citation

22   omitted).  To demonstrate that a prison official has deprived an inmate of humane conditions

23   in violation of the Eighth Amendment, two requirements must be met, one objective and one

24   subjective.  Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000).  First, "the prison

25   official's acts or omissions must deprive an inmate of the minimal civilized measure of life's

26   necessities."  Id. (internal citation omitted).  Second, the inmate must demonstrate that the

27   deprivation was a product of "deliberate indifference" by prison officials.  Wilson v. Seiter,

28   501 U.S. 294, 303 (1991).  As mentioned above, deliberate indifference occurs only if a

1  prison official is aware of a risk to inmate health or safety and disregards it: "the official must
2  both be aware of facts from which the inference could be drawn that a substantial risk of
3  serious harm exits, and he must also draw the inference."  <u>Farmer</u>, 511 U.S. at 837.

4  **B.    Isolation**

5  The Ninth Circuit has found that "administrative segregation, even in a single cell for
6  twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a
7  sentence."  <u>Anderson v. County of Kern</u>, 45 F.3d 1310, 1316 (9th Cir. 1995) (citing
8  <u>Toussaint</u>, 801 F.2d at 1091-92).  The Ninth Circuit has also recognized, however, that harsh
9  conditions such as those in the Browning Unit can cause psychological harm.  <u>See Miller v.</u>
10 <u>Stewart</u>, 231 F.3d 1248, 1252 (9th Cir. 2000) (in a death row case, experts stated that
11 conditions present in [supermax placement] can cause psychological decompensation to the
12 point of incompetency).  Other courts have found that, standing alone, the isolation inherent
13 in segregation does not violate the Eighth Amendment.  <u>In re Long Term Admin. Segregation</u>
14 <u>of Inmates Designated as Five Percenters</u>, 174 F.3d 464, 472 (4th Cir. 1999) ("the isolation
15 inherent in administrative segregation or maximum custody is not itself constitutionally
16 objectionable"); <u>Jackson v. Meachum</u>, 699 F.2d 578, 581-83 (1st Cir. 1983) (no Eighth
17 Amendment violation by confining inmate in indefinite segregation that was otherwise
18 satisfactory except for virtually no communication or association with other inmates, even
19 when conditions caused depression).

20 While it is clear that something more than isolation is required to violate the Eighth
21 Amendment, it is not clear what additional facts the standard in this Circuit requires.  The
22 Court need not resolve this issue, however, because the evidence does not show that Plaintiff
23 is incarcerated in complete isolation.  In his pleading, Plaintiff asserts that he is housed in
24 virtually total isolation, denied interaction with other inmates, and permitted only limited
25 visitation through protective glass (Doc. 13 at 8).  But Defendants' evidence shows that
26 inmates housed at the Browning Unit may communicate orally with inmates in neighboring
27 cells (Doc. 44, DSOF ¶ 136 (Doc. 44 at 37)).  STG-validated inmates may also have a two-
28 hour, non-contact visit with up to four visitors per week (<u>id.</u> ¶ 149).  Plaintiff is also allowed

one fifteen-minute phone call per week (id. ¶ 150 (Doc. 44 at 40)), see Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996) (prisoner telephone access is subject to reasonable security limitations), and may possess soft-cover books, cassette players and headphones, and poker cards (id. ¶ 151 (Doc. 44 at 41)).  Some STG-validated inmates are also eligible for colored pencils and drawing tablets or special education services through in-cell education programs (id. ¶¶ 147, 157 (Doc. 44 at 39, 42)).

The undisputed evidence shows that Plaintiff has opportunities for limited social contact and therefore is not isolated to a degree that would violate the Eighth Amendment. Moreover, as discussed above, Plaintiff may initiate the debriefing process at any time to obtain a transfer out of the Browning Unit and its limits on social contact.  Defendants will be granted summary judgment on the isolation claim.

## C.    Recreation

Exercise is a basic human necessity protected by the Eighth Amendment, and the deprivation of outdoor exercise for inmates who are under long-term segregation violates the Constitution. Keenan, 83 F.3d at 1089. But restricting a prisoner's exercise privileges may be reasonable if the prisoner represents a serious security risk. LeMaire v. Maass, 12 F.3d 1444, 1458 (9th Cir. 1993).  Five hours of exercise per week has been found to be constitutionally sufficient. See Baptisto v. Ryan, 2006 WL 798879, at *33 (D. Ariz. March 28, 2006) (collecting decisions of the Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits).

Plaintiff alleges that STG inmates are not permitted outside and the area for exercise is simply a 10x20 walled enclosure with 20-foot high walls and a steel-grated top (Doc. 13 at 9).  He states that he gets no direct sunlight and the area is not big enough for running or jogging (id.).  He further states that he is provided no exercise equipment beyond a racquetball (id.).

Defendants proffer evidence showing that STG-validated inmates in the Browning Unit are scheduled for six hours of out-of-cell recreation per week in the recreation enclosure (id. ¶ 158 (Doc. 44 at 42)).  Generally, recreation periods occur on three different days of the

week and are two hours in duration (id.).  The recreation enclosure has a cement floor and walls, and the steel mesh top allows fresh air and sunlight into the area (id. ¶ 159 (Doc. 44 at 42)).  STG-validated inmates may become eligible to use a racquetball, a hackie sack, a kickball, or a walkman during their recreation period (id.).  Defendants note that inmates may also exercise in their cells (id. ¶ 158 (Doc. 44 at 42)).

In failing to respond, Plaintiff does not dispute that he receives six hours of exercise per week.  Further, the evidence shows that he gets natural light and fresh air.  On this record, Defendants are entitled to summary judgment on Plaintiff's exercise claim.

### D.   Food

"The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing."  LeMaire, 12 F.3d at 1456.  "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."  Id. (internal citations omitted).  But if an inmate is served meals with insufficient calories for long periods of time, he may be able to demonstrate a violation of his right against cruel and unusual punishment.  Id.

Plaintiff alleges that he is provided just one hot meal a day along with a cold sack-lunch meal that serves as a combined breakfast and lunch (Doc. 13 at 9).  He states that Ryan and Ramos have enforced this restricted diet on STG inmates due to budget cuts and as a form of punishment (id.).

Defendants confirm that inmates at the Browning Unit received a reduced-calorie diet due to their sedentary lifestyle (Doc. 44, DSOF ¶ 153 (Doc. 44 at 41)).  According to Defendants' evidence, a nutritionist designed the reduced-calorie diet to ensure that inmates receive the proper amount of calories and nutrition (id.).  STG-validated inmates receive three-meals-per-day during the week and two-meals-per day on the weekends, with one hot meal each day (id. ¶ 156 (Doc. 44 at 42)).

Plaintiff presents no specific facts or evidence to dispute Defendants' evidence that the calories provided to him are determined by a nutritionist to meet his health needs, nor

1 does he present any evidence that Defendants have withheld food to punish STG-validated

2 inmates.  Accordingly, summary judgment is appropriate on Plaintiff's diet claim.

3       **E.**    **Privileges**

4       Plaintiff alleges that STG prisoners are denied participation in sentence-reducing

5 programs, vocational programs, and classes, and are denied opportunities to earn good-time

6 credits or to qualify for early release (Doc. 13 at 10).  These allegations fail to implicate the

7 Eighth Amendment.  There is no constitutional right to rehabilitation, and the lack of

8 educational or vocational programs does not constitute a constitutional violation.  Hoptowit

9 v. Ray, 682 F.2d 1237, 1254-55 (9th Cir. 1982), abrogated in part on other grounds by

10 Sandin, 515 U.S. 472.

11       Moreover, Defendants submit evidence that even STG-validated inmates can earn

12 privileges through the Earned Incentive Program, which is set forth in DO 809 (Doc. 44,

13 DSOF ¶ 148 (Doc. 44 at 40)).  For example, in subsequent phases, inmates may because

14 eligible for more arts and crafts materials (id., Ex. D, Attach. 4 (Doc. 44-3 at 36)).

15       The Court finds that Defendants are entitled to summary judgment on Plaintiff's claim

16 regarding privileges.

17       **F.**    **Hygiene**

18       A complete denial of personal hygiene items violates the Eighth Amendment.  See

19 Keenan, 83 F.3d at 1089-91.  Subjecting an inmate to lack of sanitation that is severe or

20 prolonged can also rise to the level of a constitutional deprivation.  Anderson, 45 F.3d at

21 1314; see Hutto v. Finney, 437 U.S. 678, 686-87 (1978).  Prison officials must provide

22 inmates with adequate sanitation.  See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).

23 If a prison official's refusal to provide adequate cleaning supplies prohibits inmates from

24 maintaining minimally sanitary cells and thereby threatens their health, it amounts to a

25 constitutional violation.  See Hoptowit v. Spellman, 753 F.2d 779, 784 (9th Cir. 1985).

26       Plaintiff states that he receives just three eight minute showers a week and is denied

27 access to mops, brooms, toilet brushes, and cleaning supplies (Doc. 13 at 10).  Defendants

28 submit that STG prisoners are issued cleaning supplies twice a week, including a scrub brush,

a sponge, and a spray bottle (Doc. 44, DSOF ¶ 137 (Doc. 44 at 37)).  The prison staff is responsible for cleaning the pod common areas (id. ¶ 138 (Doc. 44 at 38)).

Plaintiff concedes that he is allowed three showers a week, and he does not dispute that he is provided with some cleaning supplies. Thus, the undisputed evidence shows that Plaintiff is provided showers for personal hygiene and basic supplies to maintain sanitation in his cell.  Defendants will be granted summary judgment on this claim.

**VIII.   Conclusion**

Summary judgment will be granted on all claims in this case – the due process claims (Count I), the conditions-of-confinement claims (Count II), and the threat-to-safety claim (Count III).  As a result, the Court need not address Defendants' arguments for qualified immunity (see Doc. 43 at 25-28).

**IT IS ORDERED:**

(1) The reference to the Magistrate is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 43).

(2) Defendants' Motion for Summary Judgment (Doc. 43) is **granted**.

(3) Plaintiff's claims that he was denied cleaning supplies for the recreation pen, that he was denied clothes for recreation, and that he was subjected to constant cell illumination are dismissed without prejudice for failure to exhaust administrative remedies; all other claims are dismissed with prejudice.

(4) The Clerk of Court must enter judgment accordingly and terminate the action.

(5) For the reasons set forth herein, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from the judgment in this action would not be taken in good faith.

DATED this 13th day of August, 2012.

David G. Campbell
United States District Judge